Charles G. LILE, Appellant,

v.

**HANCOCK PLACE SCHOOL DISTRICT, Respondent.**

**No. 49461.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 22, 1985.

Motion for Rehearing and/or Transfer
Denied Nov. 21, 1985.

Application to Transfer Denied
Jan. 15, 1986.

Richard H. Sindel, Clayton, Sally E. Barker, Schuchat, Cook & Werner, St. Louis, for appellant.

George J. Bude, Clayton, for respondent.

GARY M. GAERTNER, Judge.

After a public hearing pursuant to § 168.118, RSMo 1978, the Board of Education of the Hancock Place School District terminated the indefinite contract of Charles G. Lile, a tenured teacher. The Board of Education (hereinafter Board) found that Charles G. Lile (hereinafter Lile or appellant) had engaged in "immoral conduct" proscribed by § 168.114.1(2), RSMo 1978, thereby rendering his contract terminable. Lile appealed to the St. Louis County Circuit Court, which affirmed the Board's decision. On appeal to this court, Lile argues that the Board's decision: (1) was not supported by competent and substantial evidence; (2) violated his right to due process; and (3) violated his right of privacy. Finding each of these arguments without merit, we affirm.

The relevant facts, as found by the Board, are largely undisputed. Appellant began teaching in the Hancock Place School District (hereinafter District) in 1975. He remained in that capacity, teaching fourth grade, until June 2, 1984, when he was suspended in connection with this action.[1]

A.H. and S.H., two minor girls, were students in the District when the hearing was held before the Board.[2] A.H. and S.H.

---

1. Having been employed as a teacher in the same school district for more than five successive years, appellant was a "permanent teacher" under the Missouri Teacher Tenure Act. Section 168.104(4), RSMo 1978.

2. In order to protect the interests of these children, we will refer to them only by their initials and will not use their parents' names.

are currently aged ten and fourteen, respectively. Their parents were divorced sometime prior to 1980. The divorce court awarded the mother legal custody of both girls.

In 1980, S.H. was a student in appellant's fourth grade class. Appellant met S.H.'s mother during that school year, and shortly thereafter they began dating. Later in 1980, the two girls and their mother began living with appellant in his home. They lived with him approximately one-half of the time thereafter until April of 1984.

In April of 1984 the girls' mother fell ill and was hospitalized. In early May, while she remained hospitalized, the girls moved out of appellant's home and began residing with their natural father. On May 6, 1984, their father filed a complaint with the St. Louis County Police Department charging that appellant had sexually abused both girls.[3] Police officers at that time questioned A.H. and S.H. about the alleged sexual abuse.

On May 7, 1984, the police contacted appellant and advised him that the charge had been filed. Appellant agreed to discuss the charge with police officers. Officer Rebecca Hendrickson was present when appellant gave his statement to the police. Officer Hendrickson testified at the hearing before the Board as a witness for the District. Based upon her testimony, the Board, in its findings of fact, found that appellant made the following admissions to the police:

(1) That he had walked into the bathroom on several occasions while the girls were taking baths and that they were free to do so when he was in the bathroom;

(2) That [A.H.] and [S.H.] had seen a nude photograph of their mother and asked Mr. Lile to take one of them, too. Mr. Lile took one of each of them while they were in the bathtub;

(3) That when [S.H.] and [A.H.'s] mother had to go to the hospital in May, 1984 he had both girls sleep with him;

(4) That he was on a medication which made him hot and therefore he walked around the house in the nude, in the presence of the girls and their mother. He further stated that [the girls' mother] was not concerned about it because the medication he was on made him impotent.

(5) He stated that on previous occasions he had taken baths with the girls when they were younger, possibly two years prior to this time [August 27, 1984]. During these occasions he helped wash them.

(6) That on one occasion Mr. Lile had [S.H.] remove her brassiere so that he could examine sores on her body.

Officer Hendrickson was also present when S.H. discussed the charge with the police. Based upon Officer Hendrickson's testimony, the Board found that S.H. made the following allegations to the police:

(1) That while Mr. Lile was sleeping with [S.H.] he reached over and around her and touched her breast;

(2) That when Mr. Lile walked into the bathroom while the girls were bathing, he at times would go to the bathroom.

(3) At the time that Mr. Lile took the nude photographs of the girls, they did not consider it a joke but were embarrassed.

Neither appellant nor S.H. testified at the hearing. Their mother testified as a witness for appellant. In its findings of fact, the Board described her testimony as follows:

[The girls' mother] testified that while she and her daughters lived with Mr. Lile all four walked around the house in the nude and that it was normal for them to do so. She further stated that it was also normal for anyone [sic] of them to go into the bathroom while one of the others might be using it. Further, that

3. Appellant was charged with second degree sexual abuse, a misdemeanor. Appellant was never convicted on the charge, although it remained pending at the time the Board held its hearing.

it was not unusual for Mr. Lile to walk into the bathroom while the girls were taking a bath. She also testified that Mr. Lile took a shower with [A.H.] shortly after [they] started living with Mr. Lile because [she] was having difficulty getting [A.H.] to take a shower. [A.H.] was five years old at the time. [She] further testified that Mr. Lile had a nickname for [S.H.], "blackie," because that was the color of her pubic hair.

One of appellant's former students and several parents of his past and present students testified as witnesses for appellant. Each of them indicated that appellant was a teacher of exceptional quality, and several of the parents said they would have no objection to appellant's continuing to teach their children. The District's attorney argued that such evidence was irrelevant because the District was not challenging appellant's competency or his past record as a teacher.

The superintendent of the District learned of the sexual abuse charge in early May. He interviewed both girls on May 24–25, 1984. On June 1, 1984, the superintendent received a telephone call from a reporter for the *St. Louis Post-Dispatch*, inquiring about the charge. Later that same day the superintendent told appellant not to return to the classroom. The following day, June 2, articles appeared in the *Post-Dispatch* and the *St. Louis Globe-Democrat* stating that appellant had been charged with sexual abuse of a thirteen-year old girl.[4] Later that day the superintendent suspended appellant for the remainder of the school year.

On June 6, 1984, the principal of the school at which appellant had been teaching, Robert Schnurmann, delivered to the superintendent a written report he had prepared describing comments made to him by students and parents concerning the sexual abuse charge against appellant. This report was received in evidence at the hearing before the Board, but neither Mr. Schnurmann nor any of the persons whose comments were recorded in the report were called to testify.[5]

After making its findings of fact, the Board reached the following conclusions:

■ The Board concludes that the acts committed by Mr. Lile, as described above in our Findings of Facts, constitute immoral conduct, unfitting him to teach children. As their teacher he has great influence on his students' social and moral behavior. This influence creates a corresponding responsibility in and out of the classroom to demonstrate to them proper moral conduct. By his actions he has shown himself unfit to do so.

■ The Board of Education concludes that there would be a cloud of uncertainty and suspicion surrounding Mr. Lile's future activities with his classroom students which would adversely impact on

4. One of the articles, entitled "Teacher is Suspended in Sexual Abuse Case," read in part: "The girl [S.H.] told St. Louis County police that Lile had slept with her in the nude and had fondled her breasts...." The other article contained similar information.

5. In its findings of fact, the Board described the report as follows:
    On Monday, June 4, 1984 and Tuesday, June 5, 1984 Mr. Schnurmann received inquiries about Mr. Lile from several parents as well as numerous students ... A Mr. and Mrs. Erxleben, parents of one of Mr. Lile's fourth grade female students went to Mr. Schnurmann and expressed their concern that Mr. Lile would be in the classroom. Mr. Schnurmann advised them that a substitute teacher would be in the classroom for the rest of the semester. Many of the children of the school approached Mr. Schnurmann to express their concern and were relieved when they were advised that Mr. Lile would not be in the classroom for the rest of the semester. Another student Debra Carter who was a student of Mr. Lile told Mr. Schnurmann that she was to go straight home if Mr. Lile was in the classroom. A lady by the name of Hicks, a mother of a fifth grade student in Elementary School Number 1 also inquired in a concerned manner about the incident involving Mr. Lile. Two students from the high school stopped by Elementary School Number 1 and inquired about Mr. Lile. Finally, Mr. Schnurmann received a call from an anonymous parent who was very concerned about Mr. Lile and stated that a first grade child had been spreading stories about Mr. Lile.
    This finding is essentially a verbatim transcription of Mr. Schnurmann's report.

his students, their parents and consequently on his ability to teach. The report from Mr. Schnurmann to [the superintendent] is evidence of that adverse impact.

The Board thus voted to terminate appellant's contract with the District.

■ Preliminarily, we note that an appellate court sitting in review of an administrative agency reviews the findings and decision of the agency rather than the judgment of the circuit court. *Feltz v. Hesselback,* 675 S.W.2d 60, 62 (Mo.App. 1984). We thus focus our attention upon the Board's findings and decision. The Missouri Teacher Tenure Act provides that an appeal from a decision of a board of education is governed by chapter 536, RSMo 1978. Section 536.140.2 delimits our scope of review in reviewing the Board's evidentiary findings.[6] We must consider all competent evidence before the Board, but our inquiry is nevertheless limited:

We may only determine whether the Board reasonably could have made its findings and reached the decision it did.... We may not substitute our judgment on the evidence, and we may not set aside the Board's decision unless it is not supported by competent and substantial evidence on the whole record, or it is contrary to the overwhelming weight of the evidence. Also we are to consider the evidence in a light most favorable to the Board's decision, together with all reasonable inferences which support it. *Moore v. Board of Education of the Special School District of St. Louis County,* 547 S.W.2d 188 (Mo. App.1977).

6. Section 536.140.2 provides, in pertinent part:
The inquiry may extend to a determination of whether the action of the agency
(1) Is in violation of constitutional provisions;
(2) Is in excess of the statutory authority or jurisdiction of the agency;
(3) Is unsupported by competent and substantial evidence upon the whole record;
(4) Is, for any other reason, unauthorized by law;
(5) Is made upon unlawful procedure or without a fair trial;

*Rafael v. Meramec Valley R–III Board of Ed.,* 569 S.W.2d 309, 314–15 (Mo.App.1978).

Our scope of review is less restricted if the appellant challenges the agency's interpretation or application of a law or legal standard. Section 536.140.3, RSMo 1978. In such case the reviewing court may independently weigh the evidence and resolve factual issues, but in so doing "the court shall give due weight to the opportunity of the agency to observe the witnesses, and to the expertness and experience of the particular agency." *Id. See also City of Cabool v. Missouri State Board of Mediation,* 689 S.W.2d 51, 54 (Mo. banc 1985); *Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Commission,* 669 S.W.2d 548, 553 (Mo. banc 1984).

■ In his first allegation of error, appellant argues that the Board erred in basing its decision upon incompetent and insubstantial evidence. More specifically, appellant claims that two findings of fact critical to the Board's decision were supported only by incompetent hearsay evidence. He first challenges the Board's finding that "while [he] was sleeping with [S.H.] he reached over and around her and touched her breast." We need not consider the merits of this challenge, however, because we find, as discussed below, that even in the absence of this finding there was competent and substantial evidence in the record to support the Board's decision. An erroneous finding or conclusion by an administrative agency is not grounds for reversal of the agency's decision if other competent and substantial evidence supports that decision. *Lang v. Lee,* 639 S.W.2d 111, 114 (Mo.App.1982).

(6) Is arbitrary, capricious or unreasonable;
(7) Involves an abuse of discretion.
The scope of judicial review in all contested cases, whether or not subject to judicial review pursuant to sections 536.100 to 536.140, and in all cases in which judicial review of decisions of administrative officers or bodies, whether state or local, is now or may hereafter be provided by law, shall in all cases be at least as broad as the scope of judicial review provided for in this subsection....

Appellant also challenges the Board's finding that describes the contents of the report prepared by the principal, Mr. Schnurmann.[7] We find that the report, while not competent evidence of the comments recorded therein, was competent to establish that some parents and students in the District were aware of and concerned about the sexual abuse charge filed against appellant. Again, the Board's erroneous finding is not alone grounds for reversal. *Id.*

■ Appellant does not challenge the Board's other findings of fact. After reviewing the record, we have determined that those findings are supported by competent and substantial evidence. Were it our province to weigh the evidence we might have made different evidentiary findings; our inquiry is limited, however, to determining whether the Board could reasonably have made the findings that it did. *Rafael v. Meramec Valley R–III Board of Education, supra* at 314–15.

We must now determine whether those findings of fact which we have determined are supported by competent and substantial evidence justify the Board's conclusion that appellant engaged in "immoral conduct" as proscribed by § 168.114.1(2), RSMo 1978. This question involves the application of a legal standard to particular facts, and thus our scope of review on this issue is substantially independent. *City of Cabool, supra; Evangelical Retirement Homes, supra.*

The "immoral conduct" standard has been the subject of frequent and heated controversy. A school district is vested with broad powers and discretion in the management of school affairs, *School District of Kansas City v. Clymer,* 554 S.W.2d 483, 487 (Mo.App.1977), but Missouri courts have held that a school district may not terminate a teacher for engaging in immoral conduct unless such conduct has rendered the teacher "unfit for the performance of his duties." *Ross v. Robb,* 662 S.W.2d 257, 259 (Mo. banc 1983). In *Thompson v. Southwest School District,* 483 F.Supp. 1170 (W.D.Mo.1980), the leading case construing the immoral conduct provision in the Missouri Teacher Tenure Act, the court explained that this narrow interpretation of immoral conduct "fulfill[s] the legislature's intent that permanent teachers would have a measure of certainty and stability in employment without being subjected to arbitrary school board action." *Id.* at 1181–82. In determining whether a teacher's conduct has rendered him unfit to teach, the *Thompson* court adjured school boards to consider several factors:

(1) the age and maturity of the students of the teacher involved; (2) the likelihood that the teacher's conduct will have adversely affected students or other teachers; (3) the degree of the anticipated adversity; (4) the proximity or remoteness in time of the conduct; (5) extenuating or aggravating circumstances surrounding the conduct; (6) the likelihood that the conduct may be repeated. . . . [8]

*Id.* at 1182.

In the case before us, the Board found that appellant, by his own admission, regularly entered the bathroom in his home and used the bathroom facilities in the presence of two young girls; that he took a photograph of the girls while they were naked in the bathtub; that he slept with the girls while their mother was in the hospital; that he walked around the house naked in the presence of the girls; and that he took baths with the girls. The girls' mother testified that such activity occurred repeatedly over a period of more than two years, and continued up until the month prior to appellant's suspension. The evidence also established that a sexual abuse charge had been filed against appellant in connection with such conduct, and that the local newspapers had reported the charge. Principal Schnurmann's report showed that

7. *See supra* at note 4.

8. The court lists two additional factors, one concerning the motives underlying the conduct and the other concerning the potential for the conduct to have a chilling effect on the rights of other teachers. These factors are inapplicable to the instant case.

news of the charge had reached at least some students and parents.

Applying the factors enumerated in *Thompson, supra,* we hold that the Board, considering the evidence before it, properly terminated appellant's contract. First, the age and maturity of appellant's fourth grade students rendered them particularly susceptible to psychological harm. It is also likely that appellant's conduct would have a substantial adverse impact upon students and other teachers, given that the sexual abuse charge stemming from such conduct had been locally publicized. Moreover, the circumstances surrounding the conduct were aggravated because the conduct involved children of approximately the same ages as appellant's students. (Indeed, S.H. had in fact been one of the appellant's students.) The conduct at issue did not cease until shortly before his suspension, and this proximity in time further impaired appellant's fitness to teach. Finally, appellant remains likely to repeat such conduct in the future, given that his conduct was not an isolated aberrational event, but rather occurred repeatedly for more than two years. Cognizant of these considerations and of our obligation to accord due weight to the Board's experience and expertise, we affirm the Board's decision to terminate appellant's contract.

■ Before considering appellant's constitutional arguments, we briefly address his other attacks on the Board's application of the immoral conduct standard. Appellant contends that the Board has no statutory authority to regulate a teacher's conduct that occurs outside the school context. Although the Missouri courts have not ruled on this precise issue, several other courts, construing similar statutes, have held that a school board may terminate a teacher for conduct outside the school context if it can establish a sufficient nexus between such conduct and the board's legitimate interest in protecting the school community from harm. *See, e.g., Weissman v. Board of Ed. of Jefferson County School District,* 190 Colo. 414, 547 P.2d 1267 (1976). As our previous discussion indicates, appellant's conduct directly affected the school community; the Board thus established a sufficient nexus.

■ Appellant also contends that the Board had no statutory authority to base its decision upon mere speculation about the potential for future harm to the interests of the school community; the Board was required, according to appellant, to adduce evidence of actual harm. In *Thompson, supra,* however, the court explained that a school board need only show that harm has occurred "or is likely to occur." *Id.* at 1181, *quoting Weissman, supra,* 547 P.2d at 1273.[9] In the instant case, then, the Board was not required to wait until actual harm occurred. Although "mere speculation" is not a sufficient basis for a termination decision, in this case the Board established that substantial harm was likely to occur if appellant remained as a teacher.

We turn now to appellant's constitutional arguments. Appellant contends that the Board's action violated his constitutional rights to procedural and substantive due process. Appellant correctly asserts that, as a permanent teacher under the Missouri Teacher Tenure Act, he possessed a property interest in continued employment that was protected by both procedural and substantive due process. *Thompson, supra* at 1183.

■ Procedural due process requires that the government grant a person adequate notice and an opportunity to be heard before it deprives him of a property right. *Brown v. Bathke,* 566 F.2d 588, 592 (8th Cir.1977). In the case before us, appellant

**9.** The *Thompson* court's eight-factor test for immoral conduct also assumes a prospective analysis. For example, the court requires that school boards consider:

(2) the likelihood that the teacher's conduct *will have* adversely affected students or other teachers; (3) the degree of *anticipated adversity;* ... (6) the likelihood that the conduct *may be* repeated; ... (8) whether the conduct *will have* a chilling effect on the rights of the teachers involved or of other teachers.

*Id.* at 1182 (emphasis added).

claims that his right to procedural due process was violated, but he fails to indicate what procedural protections he was improperly denied. The record indicates that the Board gave appellant timely notice of the charges against him and held a public hearing at which appellant presented evidence and cross-examined his accusers. The Board subsequently issued findings of fact and conclusions of law setting forth its reasons for terminating appellant's contract. Such procedural safeguards have been held to satisfy the requirements of procedural due process. *Sullivan v. Meade Independent School District*, 530 F.2d 799 (8th Cir.1976). Accordingly, we reject appellant's procedural due process claim.

■■■ Substantive due process requires that "state action which deprives [a person] of life, liberty or property must have a rational basis—that is to say, the reason for the deprivation may not be so inadequate that the judiciary will characterize it as 'arbitrary.'" *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1, 3–4 (7th Cir.1974), *quoted in Thompson, supra* at 1183. Given that appellant had a property interest in continued employment, we must determine whether the Board's action was arbitrary or capricious. *Buhr v. Buffalo Public School District*, 509 F.2d 1196, 1201 (8th Cir.1974). In *Fisher v. Snyder*, 476 F.2d 375 (8th Cir.1973), the court held that

> a high school teacher may successfully argue that his dismissal was arbitrary and capricious if he can prove: "that each of the stated reasons [underlying his dismissal] is trivial, or is unrelated to the educational process or to working relationships within the educational institution, or is wholly unsupported by a basis in fact."

*Id.* at 377, *quoting McEnteggart v. Cataldo*, 451 F.2d 1109, 1111 (1st Cir.1971), *cert. denied*, 408 U.S. 943, 92 S.Ct. 2878, 33 L.Ed.2d 767 (1972). We find this standard applicable to the case before us.

The Board's reasons for terminating appellant's contract are by no means "trivial" or "unrelated to the educational process." A school board that entrusts a teacher with responsibility for supervising many children for several hours each day must necessarily be concerned with how the teacher comports himself in relation to children. As the United States Supreme Court has stated: "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools." *Adler v. Board of Education*, 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517 (1952). Appellant's conduct in the presence of S.H. and A.H. thus bears directly upon the Board's interest in ensuring the well-being of its students and maintaining the integrity of the school system. The Board's reasons for terminating appellant's contract are, therefore, both real and substantial, and directly related to the educational process.

The Board's decision also was not "wholly unsupported by a basis in fact." Appellant argues that the Board applied an impermissible and "unrestricted" meaning to the statutory term "immoral conduct" because it based its decision upon conduct unrelated to appellant's fitness to teach. We disagree. Our previous discussion indicates that the Board clearly established a nexus between appellant's conduct and its legitimate interest in protecting the school community. The Board's decision is thus firmly supported by the facts adduced at the hearing.

Having concluded that the reasons for the Board's decision were neither trivial, unrelated to the educational process, nor wholly unsupported by a basis in fact, we hold that appellant's right to substantive due process was not violated. We thus reject appellant's contention on this issue.

■■■ In his final allegation of error, appellant argues that the Board's decision violated his constitutional right of privacy. The Supreme Court has interpreted the Constitution to include a right of privacy:

> Although "[t]he Constitution does not explicitly mention any right of privacy,"

the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy."

*Carey v. Population Services International,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977), *quoting Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). This right of personal privacy protects the individual's "interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).[10] The "important decisions" protected by this right of privacy include "those which are 'fundamental' or 'implicit in the concept of ordered liberty....'" *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976), *quoting Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). These fundamental rights have been limited to "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul v. Davis, supra* at 713, 96 S.Ct. at 1166. The Supreme Court has not, however, extended the right of privacy to embrace any and all activities that occur in the home, or to embrace the individual's interest in living a particular "lifestyle." *See generally* Wilkinson & White, *Constitutional Protection for Personal Lifestyles,* 62 Cornell L.Rev. 563 (1977). *See also Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 68, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973) (holding that the Constitution does not protect from state regulation any and all conduct involving "consenting adults" that occurs in a nonpublic place); *J.B.K., Inc. v. Caron,* 600 F.2d 710, 711 (8th Cir.1979),

*cert. denied,* 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980).

Appellant contends that the Board's action violated his right of privacy because all of the conduct at issue occurred within his own home, a place where he had a legitimate expectation of privacy. Appellant's argument fails, however, because the right of privacy depends not only upon the *location* of the conduct, but upon the *nature* of the conduct as well. The conduct which appellant seeks to protect from regulation by the Board does not implicate any of the "fundamental rights" discussed above. Appellant was not related to the girls or their mother, thus no interest in marriage or family relationships is implicated. Nor does his conduct relate to procreation, contraception or child rearing and education. We cannot agree that appellant's interest in walking around his home naked and using his bathroom facilities in the presence of two young girls is "implicit in the concept of ordered liberty."

In support of his privacy argument, appellant relies upon *Duckworth v. Sayad,* 670 S.W.2d 88 (Mo.App.1984), wherein this court reversed the dismissal of a police officer for alleged sexual misconduct. The officer had been observed engaging in a sexual act with an unidentified female in a dormitory room while chaperoning a youth group outing.[11] In holding that the dismissal violated the officer's constitutional right of privacy, we made clear that not only did the officer's conduct occur in a place where he had a legitimate expectation of privacy (a dormitory room), but the type of conduct in which he was engaged (sexual conduct) also afforded him a right of privacy.[12] Appellant's conduct in the case before us is not sexual, nor does it fall within any of the other categories of con-

---

**10.** A second branch of the right of privacy protects the individual's "interest in avoiding disclosure of personal matters." *Id.* 429 U.S. at 599, 97 S.Ct. at 876. Appellant does not seek to invoke this second branch.

**11.** Although the original charge against the officer specified that the sexual act involved a sixteen-year old female whom the officer was chaperoning, the evidence presented at the offi-

cer's dismissal hearing indicated that the female's age and identity were unknown. *Id.* at 90.

**12.** "The right to privacy is not limited to the marital relationship but encompasses the right of the individual to privacy regardless of marital or nonmarital sexual conduct." *Id.* at 91.

duct protected by the right of privacy. Appellant's conduct does not, therefore, implicate any legitimate privacy interest, and for that reason appellant is not entitled to the same constitutional protection that the officer in *Duckworth* received.

Although we have determined that appellant has no protectible privacy interest, we further observe that the existence of such an interest would not mandate reversal of the Board's decision. The right of privacy, like other constitutional rights, is not absolute. When this right comes into conflict with legitimate state interests, a balance must be struck. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Sullivan v. Meade Independent School District, supra* at 804. As discussed above, the Board in this case has an important interest in protecting the well-being of its students and the integrity of the school system. Appellant claims a countervailing interest in such conduct as bathing in the nude and sleeping with two school-age girls. Appellant is not related to either of the girls, and they are of approximately the same ages as appellant's students. One of the girls, S.H., was in fact a student in appellant's fourth grade class when appellant began dating her mother. The mother testified that appellant had nicknamed S.H. "blackie" because that was the color of her pubic hair. Given this evidence, we conclude that the Board's interests outweigh those asserted by appellant. Having accepted the unique position and responsibility of a schoolteacher, appellant cannot invoke his right of privacy to prevent the Board from regulating conduct that threatens its vital interests.

Finally, appellant argues that the fourth amendment creates a general right to be free from government invasions "of the sanctity of a man's home and the privacies of his life." *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The fourth amendment does not, however, create any general right of privacy. *See Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967). It protects only against certain types of government intrusions, to wit, unreasonable searches and seizures. *Id.* In the case before us, appellant does not seek to suppress evidence seized in the course of an unreasonable search and seizure, and thus the fourth amendment affords him no protection against the Board's action. *See Paul v. Davis, supra* at 713, 96 S.Ct. at 1166.

Having concluded that appellant's conduct is not protected by the right of privacy created under the fourth and fourteenth amendments, we hold that the Board's action did not violate his right of privacy.

Judgment affirmed.

DOWD, P.J., and PUDLOWSKI, J., concur.