**AFFILIATED MEDICAL TRANSPORT, INC., Plaintiff–Appellant,**

v.

**STATE TAX COMMISSION OF MISSOURI, et al., Defendant–Respondent.**

No. 54221.

Missouri Court of Appeals, Eastern District, Division Two.

June 28, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 3, 1988.

Application to Transfer Denied Sept. 13, 1988.

James E. Reynolds, St. Louis, for plaintiff-appellant.

Donald Gerard Dylewski, Government Counsel, St. Louis, for defendant-respondent.

DOWD, Judge.

Appellant Affiliated Medical Transport, Inc. [hereinafter Affiliated] appeals from the Missouri State Tax Commission's [hereinafter the Commission] denial of an ad valorem tax exemption. The circuit court affirmed the Commission's decision. The prior decision and order by the Commission concluded that the subject property would not be exempt from taxation under the charitable use exemption, because the property was not "actually and regularly used exclusively for purely charitable purposes" as required by the test set forth by the Missouri Supreme Court in *Franciscan Tertiary Prov. of Mo., Inc. v. State Tax Comm'n.*, 566 S.W.2d 213 (Mo.banc 1978). The decision and order of the Missouri State Tax Commission is reversed. This cause is remanded to the Commission with directions to enter an order declaring the subject property exempt from taxation and to return to Affiliated any funds remaining in the subject escrow account and any protested taxes disbursed from this escrow account.

Affiliated was incorporated in November 1983 as a Missouri not-for-profit corporation for the charitable purpose of providing mobile emergency medical care to the community on behalf of the St. Louis University Hospitals [hereinafter the University]. Affiliated's Articles of Incorporation provide in relevant part that:

[Affiliated] is organized exclusively for charitable, scientific and educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1954 ... including, for such purposes, to provide mobile medical and medical transport services throughout metropolitan St. Louis to members of the community....

....

No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to; its directors, officers or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this Article 5.

Affiliated's Articles provide that upon dissolution or liquidation Affiliated's assets shall be distributed to the University. If at the time of Affiliated's dissolution the University is not qualified under § 501(c)(3) of the Internal Revenue Code for a charitable exemption, Affiliated's Articles provide that its assets will not be distributed to the University but will be distributed to some other organization willing to carry on its charitable work.

Shortly after Affiliated's incorporation, St. Louis University purchased certain assets, including a combination office and ambulance garage, ambulances, automobiles, and office equipment, and transferred these assets to Affiliated for no consideration. This property is used by Affiliated when providing mobile emergency medical services to the community. The University itself is a tax-exempt entity and is exempt from federal income taxes as an educational institution and a teaching hospital under the charitable exemption contained in § 501(c)(3) of the Internal Revenue Code. Any gifts contributed to Affiliated are deductible as charitable contributions for the purposes of the Missouri income tax and federal gift and estate taxes. Moreover, Affiliated is exempt from Missouri sales and use taxes. §§ 144.030.-2(19), 144.615, RSMo Cum.Supp.1985.

Instead of retaining the subject property and using it to provide mobile emergency services to the community, the University decided to conduct its emergency services through a separate, but controlled, not-for-profit corporation. The University's decision enables the University to insulate its other assets from the potential liability arising from the high-risk activities associated with providing mobile emergency medical services.

Affiliated offers its mobile emergency services to the entire community and also operates the University's medical air rescue services, emergency room facilities, and trauma units. Prior to providing emergency medical transportation services, Affiliated routinely determines whether patients are covered by insurance or whether they have the financial ability to cover the services provided. Affiliated has removed nonpaying patients who were initially transported to its emergency room and stabilized after making this determination. While Affiliated has in the past on isolated occasions denied its services to indigent patients on the basis of their inability to pay the applicable rates for the particular services, Affiliated generally has transported indigent and uninsured patients. Over five percent of Affiliated's revenues fall within its provision for nonpaying allowances and doubtful accounts. Affiliated also provides free ambulance service for events sponsored by other charitable organizations in the community and renders services to medicare and medicaid patients in excess of the reimbursements provided to Affiliated from these programs.

Since much of Affiliated's nonpaying care is reimbursed by the University and reflected in the University's consolidated financial summary, Affiliated's financial statements are not a fair indicator of the amount of services provided by Affiliated to indigent persons. All receipts of Affiliated are transferred into the University's main account, and any withdrawal from this account requires the signature of an officer of the University. Requirements for being a named director of Affiliated include the prior approval of the president of the University and the status of employee or trustee of the University. The daily affairs are managed by high-ranking officers of the University.

As of September 1984, Affiliated's Statement of Revenues and Expenditures indicated that during its first nine months of operations, Affiliated's nonpaying accounts exceeded five percent of its revenue from services, and Affiliated rendered services

to medicare and medicaid patients in excess of the reimbursements available to Affiliated from these programs in the amount of $38,839.50 and $848.53 respectively. Using University funds, Affiliated made capital expenditures of approximately $300,000.00 in 1984. During the first six months of operation, Affiliated made 15,916 ambulance trips and 646 medical air rescue flights and was responsible for 13,319 emergency room visits. Affiliated testified that its rates would increase in proportion to the rate of increase in operational costs.

The assessor for the City of St. Louis denied Affiliated an exemption from real and personal property taxes provided by § 137.100(5), RSMo 1986, and placed the subject property on the general assessment roll for the City of St. Louis for 1984. The Board of Equalization of the City of St. Louis as well as the State Tax Commission of Missouri denied Affiliated's appeal requesting a tax exemption on the ground that the property is used for charitable purposes. The Commission denied Affiliated's claim of entitlement to the charitable use exemption from ad valorem taxation by finding Affiliated did not present persuasive evidence demonstrating that the dominant use of the subject property is for the benefit of an indefinite number of people in the community regardless of their ability to pay for the services rendered. The Commission also found the evidence of Affiliated's denial of emergency medical transportation service to some indigents requiring the service fatal to its claim of entitlement to the charitable use exemption from ad valorem taxation. Affiliated paid the 1984 assessed taxes under protest and filed for review of the Commission's decision in the circuit court. The circuit court affirmed the Commission's decision. Affiliated appeals. We reverse and remand.

■ The Commission in its brief outlines the guiding principles to follow when considering Affiliated's claim. Included are some well-established legal principles such as taxation of property is the rule, and exemption is the exception to this rule. *Mo. Church of Scientology v. State Tax Comm'n.,* 560 S.W.2d 837, 844 (Mo. banc 1978). The law disfavors claims for exemptions from taxation. *Id.* The substantial burden of establishing the property falls within the exempted class is on the person claiming exemptions under the referenced constitutional and statutory provisions. *City of St. Louis v. State Tax Comm'n.,* 524 S.W.2d 839, 843 (Mo. banc 1975). To prevent the curtailing of the purpose and intended scope of a tax exemption, the exemption statute is to be strictly but reasonably construed. *Id.* at 843–44.

■ Affiliated contends on appeal that the Commission erred by not finding the subject property falls within the charitable tax exemption provision of § 137.100(5), RSMo 1986, because the property was exclusively used to provide charitable emergency medical services to the community at large. Preliminarily, we note that this court reviews the findings and decision of the agency and not the judgment of the circuit court when sitting in review of an administrative agency. *City of Cabool v. Mo. State Bd. of Mediation,* 689 S.W.2d 51, 53 (Mo. banc 1985). This appeal involves questions of application of a revenue law already construed by the Missouri Supreme Court, and therefore, our scope of review is less restricted since Affiliated challenges the Commission's interpretation or application of a law or legal standard. § 536.140.3, RSMo, 1986; *Lile v. Hancock Place School Dist.,* 701 S.W.2d 500, 504 (Mo.App.1985). This court may independently weigh the evidence and resolve factual issues, but in so doing "the court shall give due weight to the opportunity of the agency to observe the witnesses, and to the expertness and experience of the particular agency." § 536.140.3, RSMo 1986.

■ Affiliated in its sole point on appeal contends that the subject property is exempt from ad valorem taxation, on the ground that it is "actually and regularly used exclusively for purposes purely charitable and not held for private or corporate profit." § 137.100(5), RSMo 1986. Affiliated further argues the circuit court therefore erred by affirming the Commission's decision, because the Commission improper-

ly applied the Missouri Constitution and statutes by not finding the property to be exempt even though the property was used exclusively to provide charitable emergency medical services to the community at large.

The seminal case interpreting this area of law is *Franciscan Tertiary Prov. Mo., Inc. v. State Tax Comm'n.*, 566 S.W.2d 213 (Mo. banc 1978). In that case, the Missouri Supreme Court delineated a three prong test to be used when determining whether property is exempt from taxation. Under the *Franciscan* test the following three requirements must be met before an exemption will be permitted. First, the property must be owned and operated on a not-for-profit basis. *Franciscan, supra,* at 224, 226. Second, the property must be unconditionally dedicated to the charitable use, and no private profit may result. *Id.* Additionally, the dominant use of the property must benefit society generally or an indefinite number of people. *Id.* Applying the *Franciscan* test to the case at bar, we find Affiliated satisfies all three prongs of the test, and therefore, the subject property is exempt from taxation.

Affiliated satisfies the first prong of the *Franciscan* test, because the subject property is owned and operated on a not-for-profit basis. Affiliated uses the property to provide mobile emergency medical care on a nonprofit basis to the St. Louis community. Affiliated's Articles of Incorporation specifically provide that Affiliated is "organized exclusively for charitable, scientific and educational purposes ... to provide mobile medical and medical transport services throughout metropolitan St. Louis to members of the community." The Articles further provide that no part of the net earnings of Affiliated inure to the benefit of any directors, officers or other private persons. Any revenues earned have been used to further the charitable purposes of Affiliated as provided within its Articles of Incorporation.

The Commission's finding that as of September 1984 Affiliated has returned a net profit of $32,000.00 from its emergency medical transportation services fails to con-sider the University's costs in acquiring the assets to be used by Affiliated and the capital expenditures of $300,000.00 by the University. Since 1984 the University has distributed to Affiliated approximately $80,000.00 more than it has received from Affiliated. Moreover, the Commission's focus on this purported profit ignores a well-established Missouri case law which provides:

> The requirement that the property must be operated as a not-for-profit activity does not mean that it is impermissible for the project at times or even fairly regularly to operate in the black rather than on a deficit basis, provided, of course, that any such excess of income over expense is achieved incidentally to accomplishment of the dominantly charitable objective and is not a primary goal of the project, and provided further that all of such gain is devoted to the charitable objectives of the project.

*Franciscan, supra,* at 224. The Missouri Supreme Court has cited with approval this quoted passage in two subsequent *en banc* opinions. *See Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Comm'n.*, 669 S.W.2d 548, 556 (Mo. banc 1984); *Sunday School Bd. of the Southern Baptist Convention v. Mitchell,* 658 S.W.2d 1, 5 (Mo. banc 1983).

The Commission's attempt to append an additional requirement to the *Franciscan* test in its decision by requiring Affiliated to serve primarily the indigent has been rejected by the Missouri Supreme Court in *Franciscan.* The Court explicitly declined to make the economic status of a charity's beneficiaries a criterion for determining whether to grant the charity tax-exempt status and supported this decision by citing the recognized proposition that charity is not limited solely to the relief of the destitute. *Salvation Army v. Hoehn,* 354 Mo. 107, 188 S.W.2d 826, 830 (1945). The Missouri Supreme Court in *Evangelical* refused to require self-sustaining charitable institutions to offer free access to all indigents or risk losing their tax-exempt status. The Court in *Evangelical* justified this policy by stating: "[W]e need be chary of attempting to impose financial standards

regarding tax exemptions on those institutions providing a home to aged people. The self-sustaining charity should not be placed in the position of choosing between a self-destructing influx of destitute elderly and tax exempt status." *Evangelical, supra,* at 556.

The Commission would define charity in the context of charitable institutions as being the caretaker and provider for all indigents. The Missouri Supreme Court sitting *en banc,* however, has concluded that it is not impermissible under the *Franciscan* test for the charity in question to operate in the black on a regular basis so long as charity is the dominant objective. *Evangelical, supra,* at 556. In fact, the Missouri Supreme Court has defined charity as being "a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, ..., by relieving their bodies from disease, suffering, or constraint.... A charity ... may affect any of the whole people, although only a small number may be directly benefited, it is public." *City of St. Louis v. State Tax Comm'n.,* 524 S.W.2d 839, 844 (Mo. banc 1975). The Court in this case further noted that the definition of charity as "a gift designed to promote the public good ... without any particular reference to the poor ..." is recognized in Missouri. The Commission's definition of charity has never been adopted or used by the Missouri Supreme Court, and therefore, this court will not utilize this definition in the case at bar. Affiliated's purpose is to provide emergency health care to the community as a whole on a not-for-profit basis, not to exclusively provide free indigent care, because Affiliated would not be able to exist if this was the case.

Affiliated satisfies the second prong of the *Franciscan* test, because its property is unconditionally dedicated to a charitable activity. This prong refers to the statutory mandate requiring the subject property to be used exclusively for charitable purposes. § 137.100(5), RSMo, 1986. The Missouri Supreme Court in *Franciscan* further explained that the subject property must be dedicated unconditionally to the charitable use, and therefore, there can never be a

profit, presently or prospectively, to individuals or corporations. *Franciscan, supra,* at 224. Any profit resulting from the use of the subject property must be devoted to the attainment of charitable objectives. *Id.*

The general nature of the owning organization except that it is a not-for-profit is not determinative of whether the use of the subject property is charitable or not. *Franciscan, supra,* at 223. The Missouri Supreme Court, however, has implicitly recognized that the relationship between the hospital, in both cases not-for-profit corporations, and the subject exempt property is indicative of the charitable nature of the property's use. *See Bethesda General Hosp. v. State Tax Comm'n.,* 396 S.W.2d 631 (Mo.1965); *Barnes Hosp. v. Leggett,* 589 S.W.2d 241 (Mo. banc 1979). Our Supreme Court in *Bethesda General Hospital* held that the residential properties, owned by a charitable hospital and occupied by key hospital personnel, who were on call and necessary to the efficient operation of the hospital, were exempt from taxation. *Id.* at 635. The Court justified the granting of the tax exemption by noting the use of the property was "reasonably connected to [the hospital's] charitable purpose of operating the hospital." *Id.* The hospital utilized the subject exempt property to enhance the hospital's delivery of medical care to the community in much the same way Affiliated uses its property to do the same in the St. Louis community. St. Louis University Hospital, a tax-exempt entity, uses Affiliated and its properties to assist in its provision of emergency medical services to the community. The court in *Barnes Hospital* considered the relationship between Barnes Hospital and Washington University with respect to the use of the property when determining a charitable exemption could be granted. *Barnes Hospital, supra,* at 242–43. Likewise, this court considered the relationship between Affiliated and the University when making the determination the use of the subject property is charitable.

The Commission contends that Affiliated failed to introduce any evidence showing

how Affiliated invested or utilized its profits in furtherance of any charitable objectives and that Affiliated operates for the express purpose of generating profits. The Commission concedes that it is permissible for Affiliated at times or even fairly regularly to operate in the black, but the Commission points out that this profit must be achieved incidentally to the accomplishment of the dominantly charitable objective, and attaining a profit cannot be Affiliated's primary goal. *See Id.*

The Commission concedes that no individual or corporation has ever benefited from the profits it alleges Affiliated has earned, but the Commission questions Affiliated's deposits being directly made to the University. Affiliated admitted in its testimony that as of September 1984 it had a reserve of revenue over expenses in the amount of $32,000.00, but this figure does not take into account the daily operating expenses, the initial $300,000.00 start-up funds, and the purchase of the original assets, all of which have been donated by the University. Affiliated has never declared any dividends or made any distributions of any kind to its directors, officers, or other private persons. Instead, any revenues earned by Affiliated have been used to further its charitable purposes as supported by the Internal Revenue Service and the Missouri Department of Revenue's recognition of Affiliated's charitable status. Moreover, the Commission improperly characterized certain monies as profits without taking into account the acquisition costs covered by the University or the capital expenditures made by the University. In addition, Affiliated on a regular basis administers indigent medical care, but this is not reflected in its financial summaries as a result of the method of recording nonpaying care of patients who have a relationship with the University Hospitals or who establish this relationship prior to Affiliated transporting them. Affiliated's cost in such a case is credited by the University to Affiliated and therefore appears as a noncollectable account on the University's books, not on Affiliated's accounting books. In 1984 alone, the University reimbursed Affiliated for approximately $100,000.00 to cover the costs for the indigent care it provided. As previously stated, the Missouri Supreme Court has implicitly recognized that the relationship between the hospital and the exempt property is indicative of the charitable nature of the property's use. *See Bethesda General Hosp. v. State Tax Comm'n.*, 396 S.W.2d 631 (Mo.1965); *Barnes Hosp. v. Leggett*, 589 S.W.2d 241 (Mo. banc 1979). Affiliated provides a substantial amount of free medical care to indigent patients and so this court finds that Affiliated devotes any profits towards attaining its charitable objectives as required by § 137.100(5).

Affiliated satisfies the third prong of the *Franciscan* test, because Affiliated uses the subject property for the benefit of an indefinite number of sick and injured patients and its services benefit the community in general. This prong requires that there be the element of direct or indirect benefit to society at large as a consequence of the benefit conferred on the persons directly served by the humanitarian activities. *Franciscan, supra*, at 224. The operation of a hospital which is open and available to paying and nonpaying patients alike is a humanitarian activity previously held to be exempt as charitable. *Id. See Community Memorial Hosp. v. City of Moberly*, 422 S.W.2d 290, 295 (Mo.1967); *Jackson County v. State Tax Comm'n.*, 521 S.W.2d 378, 383 (Mo. banc 1975). The Missouri Supreme Court in *Moberly* further explained the general status of hospitals as charitable institutions by stating:

[T]he facts that a corporation established for the maintenance of a public hospital, by its rules requires of its patients payment for their board according to their circumstances and the accommodation they receive, that *no person has individually a right to demand admission, and that the trustees of the hospital determine who are to be received, do not render it the less a public charity.* A hospital cannot, however, without losing its character as a public charitable hospital, receive pay patients to such an extent as will exhaust its accommodations and prevent its receiving and extending *hospital service to the usual*

*and ordinary number of indigent pa-
tients applying for admission under
proper rules and regulations adopted
by the authority managing and con-
trolling the operation of such hospi-
tals....*

*Moberly, supra,* at 295 (emphasis added).
Moreover, the cited passage refutes the
Commission's implied conclusion that if the
officers of a charitable health care institu-
tion exercise discretion when allocating the
charity's resources and services, this dis-
cretion disqualifies the charitable institu-
tion from receiving a property tax exemp-
tion. The Commission criticized Affil-
iated's donation of its medical transporta-
tion services free of charge to various
events sponsored by different nonprofit or-
ganizations in the community, because Af-
filiated's "corporate officers freely decide
according to their own standards which
organization will receive the benefit of its
emergency medical transportation service
free of charge." Affiliated routinely pro-
vides free ambulance services at the re-
quest of other charitable institutions in the
community, and by doing so, Affiliated pro-
vides to the public at large attending the
events free medical transportation. Affil-
iated provides such free services to benefit
the community and, Affiliated's decision is
not mandated by any rule or law, but the
officers, who are in the best position to
make such a decision, determine when and
how to allocate Affiliated's medical servic-
es to the charitable events.

In addition, the Commission questions
whether Affiliated extends its services to
the usual and ordinary number of indigent
patients. The Commission presented no ev-
idence indicating Affiliated turned away
any indigents as a result of its services
being exhausted by paying patients. In
1984 Affiliated provided approximately
$100,000.00 worth of medical care to indi-
gent patients free of charge. Further-
more, Affiliated's nonpaying accounts ex-
ceeded five percent of its revenue from
services, and Affiliated rendered services
to medicare and medicaid patients in excess
of the reimbursements available to Affil-
iated from these programs. We can there-
fore conclude Affiliated satisfied this re-

quirement by providing its services to a
normal and expected number of indigent
patients.

In its conclusions of law in support of its
decision to deny a charitable exemption, the
Commission concluded that Affiliated failed
to satisfy the element of the *Franciscan*
test requiring Affiliated to show that the
dominant use of its property is for the
benefit of an indefinite number of people.
The Commission argued that Affiliated rou-
tinely denied its emergency medical servic-
es to an indeterminate number of victims
who made the mistake of admitting their
indigency and inability to pay. Even if on
occasion Affiliated denied medical services
in isolated cases solely on the basis of the
patient's financial status, Affiliated ren-
dered nonprofit medical services to the
community at large, including the provision
of its services to the usual and ordinary
number of indigent patients as mandated
by case law in Missouri. *Franciscan, su-
pra,* at 224. The Commission's allegations
concerning the routine denial of emergency
medical care because of indigency and the
questioning of patients concerning their
ability to pay in a medical emergency be-
fore services are rendered, are not sup-
ported by the evidence in the record. No
matter if Affiliated denied its services to
some patients in certain cases solely be-
cause of their inability to pay, this does not
dictate the finding Affiliated does not qual-
ify for a charitable tax exemption. Like-
wise, this fact alone does not defeat Affil-
iated's entitlement claim to an ad valorem
tax exemption.

■ Unlike the case in *Evangelical,*
where the court denied a retirement home
a charitable exemption because its services
were systematically denied to a large per-
centage of elderly people solely on the ba-
sis of their financial status, Affiliated pro-
vides emergency medical services on a not-
for-profit basis for the benefit of the public
at large on behalf of its tax-exempt parent.
Nothing in the law disqualifies an other-
wise nonprofit charitable organization from
an exemption under § 137.100(5) if such an
organization intermingles or transfers as-
sets with another nonprofit charitable orga-
nization. During the first half of 1984,
Affiliated provided patients and trauma vic-

tims with 15,916 ambulance trips, 13,319 emergency room visits and 646 medical air rescue flights. The Missouri Constitution, statutory provisions and case law do not require an organization claiming tax-exempt status to serve only the indigent. *Franciscan, supra,* at 226. Affiliated's rendering of nonprofit medical services to the community is a charitable activity within the provisions of § 137.100(5). Section 137.100(5) does not require a claimant of a charitable exemption to provide free services to the point of operating in the red in order to be exempt or to provide services to all indigents within the community. Furthermore, there is no statutory provision requiring a claimant not to charge market rates in order to maintain its tax-exempt status. No matter what rate Affiliated charges its paying patients, this does not disqualify its property from tax-exempt status, because the basis of the exemption is Affiliated's provision of services on behalf of the community.

By charging the patients who can pay, Affiliated is enabled to provide its services to the community's poor. The cost of providing such services to the poor would be borne by state and local governments if Affiliated did not provide such services. The provision of such emergency medical care services clearly falls within the requirement that "the dominant use of the property must be 'for the benefit of an indefinite number of persons, ..., by relieving their bodies from disease....'" *Evangelical, supra,* at 553. The court in *Barnes Hospital* noted that Barnes helps the City of St. Louis shoulder part of the burden of providing care for the indigent and helpless in the community. *Barnes Hospital, supra,* at 242–43. Like Barnes, the University, with the assistance of Affiliated, helps alleviate the same burden within the St. Louis Community. The University operates Affiliated to provide patients and trauma victims including indigent and paying patients transportation and access to the University Hospitals. Like the Missouri Supreme Court in the *Barnes Hospital* case, this court examined the operation of the subject property in the context of the institutional goals of the charitable hospital. As a result, we find the requested exemption should be granted, because Affiliated overcomes every prong of the *Franciscan* test as set out in this opinion. Affiliated is owned and operated on a not-for-profit basis, its property is exclusively used to provide the community with emergency medical care, and the dominant use of its property is for the benefit of an indefinite number of people. We conclude that Affiliated uses the subject property to provide emergency medical services to benefit the public and society in general.

In view of our conclusion that Affiliated was entitled to a charitable exemption from ad valorem property taxes, we find Affiliated meets the test promulgated in *Franciscan.* Affiliated is a not-for-profit corporation whose clearly stated purpose is to operate medical emergency services on behalf of the University. The University contributed funds to supplement Affiliated so that Affiliated could meet its expenses. No profit to any individual or corporation may ever result, because Affiliated's by-laws specifically provide for any profit to be distributed in furtherance of the charitable purpose of providing mobile medical and medical transport services throughout metropolitan St. Louis to members of the community. Upon dissolution or liquidation, Affiliated's assets are to be distributed to the University. Affiliated, for the reasons cited in this opinion, is operated for purposes purely charitable within the meaning of § 137.100 and the *Franciscan* test.

For the foregoing reasons, we reverse the trial court's judgment and the decision and order of Missouri State Tax Commission. This cause is remanded to the Commission with directions to enter an order declaring the subject property exempt from ad valorem taxation and to return to Affiliated any funds remaining in the subject escrow account and any protested taxes disbursed from this escrow account.

STEPHAN, P.J., and PUDLOWSKI, J., concur.